1  WO

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Justin Perkins,                                No. CV-13-01817-PHX-BSB

10                     Plaintiff,                **ORDER**

11  v.

12  Carolyn W. Colvin,

13                     Defendant.

14  _____

15        Justin Perkins (Plaintiff) seeks judicial review of the final decision of the

16  Commissioner of Social Security (the Commissioner) denying his application for

17  disability insurance benefits under the Social Security Act (the Act).  The parties have

18  consented to proceed before a United States Magistrate Judge pursuant to 28

19  U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure

20  16.1.  For the following reasons, the Court reverses the Commissioner's decision and

21  remands for further proceedings.

22  **I.     Procedural Background**

23        On November 22, 2010, Plaintiff filed applications for disability insurance

24  benefits, child's disability insurance benefits, and supplement security income under

25  Titles II and XVI of the Act.  (Tr. 19, 160-79, 209.)[1]  Plaintiff alleged that he had been

26  _____

27        [1]  Citations to "Tr." are to the certified administrative transcript of record.

28  (Doc. 11.)

disabled since August 22, 2010 due to major depressive disorder, attention deficit hyperactivity disorder (ADHD), and a learning disorder.  (Tr. 160, 168.)  Plaintiff later amended the alleged disability onset date to October 23, 2006.  (Tr. 195.)  After the Social Security Administration (SSA) denied Plaintiff's initial applications and his request for reconsideration, he requested a hearing before an administrative law judge (ALJ).  After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act.  (Tr. 19-30.)  This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.)  Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.    Medical Record

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health.  The record also includes opinions from lay witnesses and State Agency Physicians who examined Plaintiff or reviewed the records related to his health, but who did not provide treatment.

### A.    Medical Treatment

#### 1.    David Biegen, Ph.D.

On February 15, 2008, Plaintiff began treatment with psychologist Dr. David Biegen for his complaints of depression and anger.  (Tr. 599.)  Dr. Biegen noted that Plaintiff was angry during the appointment.  (*Id.*)  During an appointment the next week, Plaintiff reported having trouble sleeping.  (Tr. 599-600.)  During a February 29, 2008 appointment, Plaintiff reported that he was not eating very well, "wanted to sleep," and considered his life hopeless.  (Tr. 601.)

Plaintiff next saw Dr. Biegen on March 7, 2008 and reported that a cruise to the Bahamas had made him happy.  (Tr. 602.)  During a visit the following week, Plaintiff reported that his parents did not let him have his own opinions and that he felt isolated and lonely.  (Tr. 603.)  During a March 21, 2008 visit, Plaintiff told Dr. Biegen that his

mother died the previous day.  (Tr. 604.)  At his next appointment, Dr. Biegen noted that Plaintiff was disoriented and tearful.  (Tr. 605.)  At an April 4, 2008 appointment, Plaintiff reported that he was tired of being angry.  (Tr. 605, 608.)  During subsequent appointments in April 2008, Plaintiff continued reporting that he was tired of getting angry "at every little thing."  (Tr. 606.)  He stated that his family expected things of him and then acted disappointed with him.  (Tr. 607.)  Plaintiff reported that he was unhappy and Dr. Biegen thought that Plaintiff was adopting tension from his family.  (*Id.*)

On June 13, 2008, Plaintiff reported that he was sleeping better, had a good appetite, and a calm mood.  (Tr. 612.)  He also reported that he felt like his family treated his sister like a first-class citizen, but treated him like a second-class citizen.  (Tr. 612.)  During a June 25, 2008 appointment, Plaintiff expressed frustration and anger at his sister.  (Tr. 615.)  At an August 8, 2008 appointment, Plaintiff stated that he was taking classes at Arizona State University (ASU) and felt like he was doing better. (Tr. 617.)  At his next appointment on August 22, 2008, Plaintiff was tired and lethargic, and on September 5, 2008 he reported being distressed without knowing why.  (Tr. 616, 618.)

In a November 1, 2010 summary of his "work" with Plaintiff, Dr. Biegen stated that he spent a lot of his time with Plaintiff "putting out fires" between Plaintiff and his family.  (Tr. 596-97.)  He reported that he did not see Plaintiff consistently enough "to work on more basic issues."  (*Id.*)  Dr. Biegen noted that when Plaintiff became "angry and depressed he believ[ed] that he hated the world and people."  (*Id.*)  He also noted that because Plaintiff had not learned how to get satisfaction from others, "he trie[d] to go it alone."  (*Id.*)

### 2.      Richard Rosengard, D.O.

On referral from Dr. Biegen, on March 5, 2008, Plaintiff saw Dr. Richard Rosengard.  (Tr. 683.)  Dr. Rosengard noted that Plaintiff's symptoms were consistent with recurrent depression that stemmed from his childhood and that he had a "great deal of comorbid anger and irritability."  (*Id.*)  Dr. Rosengard prescribed medication to help

Plaintiff sleep and to reduce his depression, anger, and irritability.  (*Id.*)  He recommended that Plaintiff continue individual therapy with Dr. Biegen.  (*Id.*)

During a May 28, 2008 appointment, Dr. Rosengard noted that Plaintiff's sleep had improved, but he continued to get agitated.  (Tr. 680.)  At a July 30, 2008 appointment, Plaintiff reported feeling "great."  (Tr. 674.)  Dr. Rosengard noted that Plaintiff's affect was blunted and diagnosed him with major depressive disorder. (Tr. 679.)

On February 21, 2010, Plaintiff presented to Dr. Rosengard as hopeless, with feelings of worthlessness, depression, and anhedonia.  (Tr. 678.)  Dr. Rosengard described Plaintiff's condition as "worsening."  (*Id.*)  On March 19, 2010, Dr. Rosengard diagnosed Plaintiff as depressed with anhedonia and noted that Plaintiff had decreased energy and hypersomnia.  (Tr. 677.)  Plaintiff reported insomnia during June 2010. (Tr. 676.)  During an October 5, 2010 appointment, Dr. Rosengard noted that Plaintiff's mood was "fine."  (Tr. 667-74.)

### 3.    Treatment at Southwest Behavioral Health Services

On October 21, 2010, Plaintiff began psychiatric treatment at Southwest Behavioral Health Services (SBHS) and underwent an initial assessment.  (Tr. 626-47.) During that assessment, Plaintiff stated that he was angry, hated people, and preferred to be alone.  (Tr. 633.)  Plaintiff reported that he was unable to attend school because of his depression.  (Tr. 640.)  Plaintiff's affect was noted to be very flat and his "self-concept" was low.   (Tr. 639-40.)   Plaintiff got defensive with his father, who attended the appointment, when he thought his father was suggesting that certain activities, such as securing and maintaining a job, would be challenging for Plaintiff.  (*Id.*)

On November 16, 2010, Stephen Brockway, M.D., a psychiatrist at SBHS, evaluated Plaintiff.  (Tr. 622-25.)  Plaintiff reported that his medications were working well and helping his depression, anxiety, and insomnia (Tr. 622), but his sleep was still poor.  (*Id.*)  Dr. Brockway noted that "[t]alking therapy had been helpful."  (Tr. 622.)

1    On February 4, 2011, Plaintiff reported to medical providers at SBHS that he
2    continued to experience low energy and insomnia.  (Tr. 655.)  A February 4, 2011
3    treatment note described Plaintiff's affect as blunt and his mood as neutral.  (*Id.*)  On
4    April 5, 2011, Plaintiff reported that he had not improved, that he was sleeping too much,
5    and that he wanted to reduce his medication.  (Tr. 656.)  On June 1, 2011, Plaintiff
6    reported that Risperdal that he was taking for insomnia was giving him nightmares, and
7    he was taken off that medication.  (Tr. 689.)  During that same visit, Plaintiff reported
8    that his mood was improving, he was "socially more interested," and "overall better."
9    (Tr. 689.)

10   In February 2012, Plaintiff reported that he wanted to study his computer
11   programming books but had been unable to open them due to his low energy and lack of
12   motivation.  (Tr. 707.)  On February 17, 2012, Dr. Houshang Semino at SBHS completed
13   a mental status examination and noted that Plaintiff denied delusions and hallucinations,
14   that he had good concentration, appropriate affect, good insight, and good judgment.
15   (Tr. 719.)  Dr. Semino also noted that Plaintiff had an anxious mood.  (*Id.*)  Dr. Semino's
16   "clinical impression" described Plaintiff as "stable."  (*Id.*)

17   **B.      Medical Opinion evidence**

18   **1.      Dr. Biegen**

19   On June 4, 2010, Dr. Biegen wrote a letter to the Maricopa County Superior Court
20   recommending that the court excuse Plaintiff from jury duty due to his "major
21   depression," which produced symptoms of sadness, feelings of emptiness, and a "loss of
22   concentrate and attention."  (Tr. 495.)

23   On July 23, 2011, Dr. Biegen completed a Mental Residual Functional Capacity
24   assessment (MRFC).  (Tr. 661-63.)  He opined that Plaintiff was moderately limited[2] in
25   his ability to understand, remember, and carry out detailed instructions, maintain
26   attention for extended periods, perform activities within a schedule, complete a normal

---

27   [2]  The MRFC assessment form defined "moderate" as "able to perform designated
28   task or function, but has or will have noticeable difficulty (distracted from job activity)
     from 11-20 percent of the work day or work week (i.e. more than one hour/day or more
     than one-half day per week)."  (Tr. 661.)

workday and perform at a consistent pace, accept instructions and criticism from supervisors, and to travel in unfamiliar places or use public transit.  (*Id.*)  He found that Plaintiff had no or mild limitations in several other areas of mental functioning.  (*Id.*)

In an April 20, 2012 letter to Plaintiff's attorney, Dr. Biegen stated that because he did not treat Plaintiff before February 15, 2008, he could not attest to any of Plaintiff's limitations before that date.  (Tr. 723.)  He also stated that he had reviewed a report, MRFC assessment, and an addendum that Gregory Novie, Ph.D. prepared, and he believed these reports described Plaintiff well.  Dr. Biegen also suggested that Plaintiff's performance might have deteriorated since his last visit.  (*Id.*)

### 2.    Gregory Novie, Ph.D.

At the request of Plaintiff's lawyer, on December 6, 2011, Dr. Novie conducted a psychological examination of Plaintiff that included psychometric testing, review of the medical record, a clinical interview of Plaintiff, and interviews of Plaintiff's father and stepmother.  (Tr. 692-702.)  Dr. Novie opined that Plaintiff suffered from a significant depressive condition and that he had periods of frustration, anger, social withdrawal and reclusiveness. (Tr. 696.)  He opined that Plaintiff was "fragile psychologically before his mother's death with limited capacity for interpersonal relationships as well as overall adaptive functioning." (*Id.*)

Dr. Novie noted that Plaintiff's depression "appear[ed] to affect a wide range of aspects of functioning."  (Tr.  696.)  Testing that Dr. Novie conducted indicated that Plaintiff had significant limitations in fluid problem solving and speed processing.  (*Id.*)  Dr. Novie diagnosed Plaintiff with major depressive disorder that was recurrent and severe without psychotic features, and with ADHD, combined type. (Tr. 697.) Dr. Novie opined that Plaintiff would "have trouble meeting the demands of work pace and pressure" and that he was moderately-severely to severely limited in those abilities.  (*Id.*)  He found that Plaintiff was "severely limited" in his ability to complete a normal workday and work week without interruptions from his major depressive condition.  (*Id.*)

On December 6, 2011, Dr. Novie completed an MRFC assessment.  (Tr. 703-05.) He opined that Plaintiff was severely limited in his ability to respond to customary work pressure and to complete a normal workday.  (Tr. 704.)  He also found that Plaintiff had moderately-severe limitations in his ability to maintain attention for extended periods, perform within a schedule ("processing speed at 5th percentile") or perform at a consistent pace, sustain an ordinary routine without special supervision, work in coordination with others, make simple work-related decisions, interact appropriately with the general public, accept instructions and criticism from supervisors, get along with co-workers, maintain socially appropriate behavior, and adapt in the work place.  (Tr. 703-04.)  In an addendum to his evaluation, dated March 26, 2012, Dr. Novie stated that the limitations assessed in his December 6, 2011 MRFC had been present since at least December 6, 2010, and that he would place the earliest onset date as the date of Plaintiff's mother's death in 2008.  (Tr. 721.)

## III.    The Administrative Hearing

Plaintiff, his father, and his stepmother testified at the administrative hearing.  A vocational expert did not testify at the hearing.  Plaintiff was in his mid-twenties at the time of the administrative hearing and the ALJ's decision.  (Tr. 41.)  He had a high school education and had completed some community college courses.  (*Id.*)  Plaintiff testified that he took special education classes in high school because he had trouble with math and English.  (Tr. 43-44.)  He last worked in September 2010 as a telephone technical assistant for servicing modem routers.  (Tr. 41-42.)  He previously worked part time at Wal-Mart.  (Tr. 42.)  Plaintiff testified that his depression, including his lack of motivation and fear of interacting with people, made it difficult for him to be in work environments.  (Tr. 45.)

Plaintiff stated that he started mental health counseling before his mother died and continued that treatment after her 2008 death.  (Tr. 44.)  He testified that he often isolated himself at home and that he had ongoing difficulties getting along with his father and stepmother.  (Tr. 46.)  He stated that he had a hard time enjoying life even when he took

medication for his depression.  (*Id.*).  Plaintiff testified that he had anger issues and stated that he "doesn't necessarily understand people and their emotional value."  (Tr. 47.)  Additionally, he testified that he often stayed up until three in the morning and slept in the afternoon.  (*Id.*)  He stated that his doctor at SBHS prescribed medication to help him sleep, but that it did not help.  (Tr. 48-49.)

Plaintiff's stepmother Debra Perkins testified about her observations of Plaintiff since she started dating his father in 2009.  (Tr. 50.)  She testified that Plaintiff exhibited aggressive behavior, including verbal aggression.  (*Id.*)  She stated that Plaintiff was fired from a part-time job at a grocery store because he behaved inappropriately and had difficulty dealing with customers.  (Tr. 51.)  She also stated that Wal-Mart would not hire Plaintiff again because he was standoffish with customers.  (*Id.*)  She testified that when Plaintiff was fired from a call center job, he claimed that he was told he could use that employer as a reference; however, Plaintiff's stepmother believed this was based on the voices that Plaintiff sometimes heard when he was alone.  (Tr. 55.)

Plaintiff's stepmother stated that she and Plaintiff's father had to make sure that Plaintiff completed tasks and took his medications.  (*Id.*)  She testified that Plaintiff could not complete tasks in a logical, consecutive manner, but he thought that he did.  (Tr. 56.)  She also testified that Plaintiff was nocturnal and had unusual sleep habits.  (Tr. 50.)  She stated that although Plaintiff wanted to be a computer programmer, he had a very low understanding of mathematics.  (Tr. 50-51.)

Plaintiff's father, Lonny Perkins, testified that Plaintiff had experienced anger problems since he was a child.  (Tr. 52-53.)  He also testified that Plaintiff talked to himself out loud and walked around the house quickly without focus.  (Tr. 53-54.)  He testified that Plaintiff graduated from high school with some difficulty and that he had trouble completing community college courses.  (Tr. 54.)  He further stated that Plaintiff had difficulty getting along with other students and grasping the curriculum, especially math.  (*Id.*)  He testified that Plaintiff's depression worsened when his mother went through her cancer treatment and after she died.  (Tr. 55.)

IV.    The ALJ's Decision

A claimant is considered disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).   To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.   *See* 20 C.F.R. §§ 404.1520, 416.920.

A.    Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that he is not presently engaged in a substantial gainful activity, and (2) that his disability is severe.   20 C.F.R. § 404.1520(a)(4)(i) and (ii).   If a claimant meets steps one and two, he may be found disabled in two ways at steps three through five.   At step three, he may prove that his impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).   If so, the claimant is presumptively disabled.   If not, the ALJ determines the claimant's residual functional capacity (RFC).   20 C.F.R. § 404.1520(e).   At step four, the ALJ determines whether a claimant's RFC precludes him from performing his past work.    20 C.F.R. § 404.1520(a)(4)(iv).   If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.   20 C.F.R. § 1520(a)(4)(v).   If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

B.    The ALJ's Application of Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 23, 2006, the amended

alleged disability onset date.  (Tr. 22.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "major depressive disorder, attention deficit hyperactivity disorder (ADHD), and learning disorder (20 C.F.R. § 404.1520(c) and 416.920(c).)"  (*Id.*)  At the third step, the ALJ found that the severity of those impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr 22-23.)  The ALJ next concluded that Plaintiff retained the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant retains the ability to perform simple, unskilled work on a regular and continuous basis."  (Tr. 23.)  At step four, the ALJ found that Plaintiff did not have past relevant work.  (Tr. 29.)  The ALJ next concluded that, considering Plaintiff's "age, education, work experience, and [RFC], there [were] jobs that exist in significant numbers in the national economy that [Plaintiff] could perform."  (*Id.*)

Accordingly, the ALJ concluded that Plaintiff had "not been under a disability [within the meaning of the Act] from October 23, 2006, through the date of [the ALJ's] decision."  (Tr. 30.) The ALJ specifically found that "[b]ased on the application for child's insurance benefits, . . . the claimant [was] not disabled as defined in section 223(d) of the [Act] prior to October 22, 2007, the date he attained age 22."  (Tr. 30.)  He also found that "[b]ased on the application for a period of disability and disability insurance benefits, . . . the claimant [was] not disabled under sections 216(i) and 223(d) of the [Act]."  (*Id.*)  Finally, the ALJ found that "[b]ased on the application for supplemental security income, . . . the claimant [was] not disabled under section 1614(a)(3)(A) of the [Act]."  (*Id.*)

## V.   Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence

1    and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

2    (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

3    erred, however, "[a] decision of the ALJ will not be reversed for errors that are

4    harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

5           Substantial evidence means more than a mere scintilla, but less than a

6    preponderance; it is "such relevant evidence as a reasonable mind might accept as

7    adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

8    (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

9    determining whether substantial evidence supports a decision, the court considers the

10   record as a whole and "may not affirm simply by isolating a specific quantum of

11   supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

12   quotation and citation omitted).

13          The ALJ is responsible for resolving conflicts in testimony, determining

14   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

15   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

16   interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

17   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

18   **VI.    Plaintiff's Claims**

19          Plaintiff argues that the ALJ erred in discounting Dr. Novie's opinion, assessing

20   Plaintiff's credibility,[3] and failing to properly evaluate lay opinion testimony.  (Doc. 15 at

21   1.)  As set forth below, the Court finds that the ALJ provided legally sufficient reasons

22   for discounting Dr. Novie's opinion and for rejecting the lay opinion testimony.  Plaintiff

23   also argues that, based on the weight the ALJ assigned to the medical source opinion

24   evidence from Dr. Biegen, he erred in formulating Plaintiff's RFC and by failing to

25   obtain vocational expert testimony.  (Doc. 15 at 1, 13-19.)  The Court concludes that the

26   ALJ erred in formulating the RFC and in failing to obtain vocational expert testimony.

27   _____

28          [3]  The Court can resolve this matter based on its review of other issues and does
     not reach Plaintiff's claim that the ALJ erred by finding Plaintiff's symptom testimony
     not fully credible.

### A.   The ALJ's Assessment of Dr. Novie's Opinion

Plaintiff argues that the ALJ erred in assigning little weight to Dr. Novie's opinion.  (Doc. 15 at 17.)  On December 6, 2011, Dr. Novie conducted a psychological evaluation of Plaintiff, at the request of his attorney, in connection with Plaintiff's application for disability benefits.  (Tr. 692.)  Dr. Novie completed an MRFC assessment opining that Plaintiff was moderately limited in his ability to remember locations and work-like procedures, and to understand, remember, and carry out simple and detailed instructions.  (Tr. 703.)

He also found that Plaintiff had moderately-severe limitations in his ability to maintain concentration for extended periods, perform activities within a schedule (Dr. Novie noted that Plaintiff's "processing speed" was at the "5th [percent]tile), sustain an ordinary routine without supervision, work with others without being distracted, make simple work decisions, interact appropriately with the public, accept instruction and criticism from supervisors, get along with co-workers, maintain socially appropriate behavior, respond appropriately to change in the workplace, be aware of and respond to hazards, use public transportation, and to set realistic goals and work independently.  (Tr. 703-04.)  He further found Plaintiff severely limited in his ability to respond to customary work pressures and to complete a normal work day or work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 704.)

The ALJ gave this opinion "little weight" because it was "not supported by or consistent with the evidence of record." (Tr. 27.)  The ALJ also explained that Dr. Novie's notes "appeared to rely quite heavily" on information from Plaintiff's father and stepmother, whose testimony the ALJ found not fully credible.  (*Id.*)  The ALJ next stated that Dr. Novie drew "some inaccurate conclusions" from the medical record, and cited Dr. Novie's conclusion that Dr. Biegen's note recommending that Plaintiff be excused from jury duty suggested that Plaintiff had severe or moderately-severe limitations in "capacities."  (*Id.*)  Finally, the ALJ noted that Dr. Novie's report was

1   obtained by Plaintiff's counsel, not for treatment, but in "an effort to generate evidence

2   for the [appeal to the ALJ]," and Dr. Novie "was likely paid for the report." (*Id.*)

3       Plaintiff argues that these are not legally sufficient reasons for discounting

4   examining physician Dr. Novie's opinion. (Doc. 15 at 16-19.) An ALJ may reject the

5   controverted opinion of a treating or an examining physician by providing specific and

6   legitimate reasons that are supported by substantial evidence in the record. *Bayliss v.*

7   *Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Although the Court does not accept all of

8   the ALJ's reasons for his assignment of little weight to Dr. Novie's opinion, the ALJ

9   provided sufficient legally sufficient reasons that are supported by substantial evidence in

10  support of his assessment of that opinion.

## 1.    Inconsistency with the Medical Record

12      The ALJ first stated that he assigned little weight to Dr. Novie's opinion because it

13  was not consistent with, or supported by, the medical record. (Tr. 27.) The ALJ may

14  reject a treating or examining physician's opinion when it "is not well-supported" or "is

15  inconsistent with other substantial evidence in the record." *Orn v. Astrue*, 495 F .3d 625,

16  631 (9th Cir. 2007); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir.

17  2004) (stating that an ALJ "need not accept the opinion of any physician, including a

18  treating physician, if that opinion is brief, conclusory, and inadequately supported by

19  clinical findings"). Accordingly, inconsistency with the medical record was a legally

20  sufficient reason for the ALJ to assign little weight to Dr. Novie's opinion and, as

21  discussed below, is supported by substantial evidence in the record. *See Richardson*, 402

22  U.S. at 401 (substantial evidence is "such relevant evidence as a reasonable mind might

23  accept as adequate to support a conclusion.").

24      Before assigning weight to Dr. Novie's opinion, the ALJ discussed the medical

25  record and noted that the evidence of record was "quite minimal" and treatment records

26  indicated that Plaintiff's condition had improved and that medication "worked well" and

27  reduced Plaintiff's symptoms. (Tr. 24-26.) He further noted that mental status

28  examinations in the fall of 2010 found Plaintiff "alert and oriented with good eye contact,

euthymic mood, appropriate affect, mild depressive thought content, intact memory and concentration, intact attention, above average estimated intelligence, and age appropriate impulse controls, insight, and judgment."  (Tr. 26.)   Additionally, the ALJ noted that 2011 treatment notes indicated that Plaintiff's mental status examinations were "unremarkable and his condition was deemed stable," and that Plaintiff reported improvement with medication and that he was feeling better.  (Tr. 26.)

Substantial evidence supports the ALJ's description of the medical record and his finding that Dr. Novie's opinion was inconsistent with the record.  (Tr. 633 (10/21/2010) "talking therapy and medication were helpful"; Tr. 622-23 (11/16/2010) Plaintiff's medications "work well," Plaintiff reported "very little depression," his anxiety was mild, euthymic mood, appropriate affect, normal thought, oriented, appropriate insight and judgment, motivated for treatment; Tr. 689 (6/1/2011) mood improved, "socially more interested," "overall better"; Tr. 690 (8/2011) "doing well," "mood improving"; Tr. 716 (12/23/2011) calm and compliant with medication; Tr. 719 (2/17/2012) good concentration, appropriate affect, denies delusions and hallucinations, good insight and judgment, stable.)

The ALJ's discussion of the medical record that he found inconsistent with Dr. Novie's opinion did not appear on the same page of the decision on which he discounted Dr. Novie's opinion.   Instead, the ALJ's discussion of the inconsistent treatment notes appeared earlier in his decision (Tr. 24-26), and was sufficient to support his rejection of Dr. Novie's opinion.  *See Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (an ALJ must discuss and evaluate the evidence that supports findings, but need not do so under a particular heading).

### 2.      Opinion Based on Information from Lay Witnesses

Plaintiff further argues that the ALJ erred in discounting Dr. Novie's opinion on the ground that he "rel[ied] quite heavily" upon the information from Plaintiff's father and stepmother.   (Doc. 27.)   Dr. Novie's report of his psychological evaluation of Plaintiff states that Plaintiff's father "offered most of the . . . information" contained in

the "history," and "history of complaints" sections of the report.  (Tr. 693-94.)  Thus, the ALJ reasonably assumed that Dr. Novie's assessment of Plaintiff relied heavily on information from Plaintiff's father.[4]

Because the ALJ properly discredited the testimony of Plaintiff's father as discussed in Section VI.B below, the ALJ did not err in this regard.  *Cf Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (ALJ properly discounts a physician's opinion that is based solely upon claimant's self-reporting if ALJ concludes that claimant's self-reporting is not credible); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (rejecting physician's opinion in part because it was based on claimant's subjective complaints, not on new objective findings); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (medical opinion premised on subjective complaints may be disregarded when the record supports ALJ in discounting claimant's credibility).

### 3.    Inaccurate Conclusions from the Medical Record

To support his assignment of "[l]ittle weight" to Dr. Novie's opinion, the ALJ also stated that Dr. Novie "drew some inaccurate conclusions" from the medical record. (Tr. 27.)  The ALJ specifically referred to Dr. Novie's conclusion that Dr. Biegen's recommendation that Plaintiff be excused from jury duty "tend[ed] to suggest that [Plaintiff] was likely moderately severe or severe some capacities."  (Tr. 27 (citing Tr. 697).)  The ALJ reasonably concluded that Dr. Novie mischaracterized Dr. Biegen's jury excuse as supporting a finding that Plaintiff had moderately-severe or severe limitations because Dr. Biegen assessed Plaintiff with only mild or moderate functional limitations.  (Tr. 661-63.)  Accordingly, the ALJ's determination that Dr. Novie drew "inaccurate conclusions" from the medical record was a legally sufficient reason to discount Dr. Novie's opinion.

---

[4]  The psychological evaluation does not specifically state that information in that report was provided by Plaintiff's stepmother.  (Tr. 692-98.)  However, to the extent that the ALJ erred by discounting Dr. Novie's opinion as based on information provided by Plaintiff's stepmother, any error was harmless because the ALJ gave other legally sufficient reasons for discounting Dr. Novie's opinion.

### 4.      The Purpose of Dr. Novie's Evaluation and Opinion

Finally, Plaintiff argues that the fact that Dr. Novie was paid to evaluate Plaintiff and give an opinion in relation to his application for disability benefits was not a legally sufficient reason for discounting his opinion.  (Doc. 18 at 7.)  "The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them."  *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (finding the ALJ's rejection of an examining psychologist's report because it was obtained "by the claimant's attorney for the purpose of litigation," was not a legitimate basis for rejecting that opinion).  The Ninth Circuit has stated that, "[a]n examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner."  *Lester*, 81 F3d at 832 (citing *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D. Or. 1993)).  Accordingly, the fact that Plaintiff's lawyer obtained Dr. Novie's report and opinion for purposes of the administrative proceedings was not a legally sufficient reason for assigning that opinion little weight.

Although the Court does not accept all of the ALJ's reasons for assigning little weight to Dr. Novie's opinion, the ALJ nonetheless provided legally sufficient reasons that are supported by substantial evidence to support of his assessment of that opinion.

### B.      Evaluation of Lay Witness Testimony

Plaintiff further argues that the ALJ erred by rejecting the opinions of Plaintiff's father and stepmother.  (Doc. 15 at 23-26.)  Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  In rejecting lay testimony, the ALJ need not cite the specific record as long as he provides "germane" reasons for rejecting lay witness evidence.  *See Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012); *Lewis,* 236 F.3d at 511.   An ALJ is not required to discuss every witness's testimony on an individualized basis.  Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only cite to those reasons when

1  rejecting a different witness's similar testimony.  *See Valentine v. Comm'r of Soc. Sec.*

2  *Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (holding that because "the ALJ provided clear

3  and convincing reasons for rejecting [the claimant's] own subjective complaints, and

4  because [the lay witness's] testimony was similar to such complaints, it follows that the

5  ALJ also gave germane reasons for rejecting [the lay witness's] testimony").

6      Plaintiff's father and stepmother testified at the administrative hearing and

7  completed third-party statements.  (Tr. 218-29, 257-74, 294-98.)  The ALJ stated that he

8  could not give their opinions "significant weight" because (1) their opinions "made no

9  reference to exacting observations as to dates, frequencies, types and degrees of medical

10  signs and symptoms, or the frequency or intensity of unusual moods or mannerisms . . .",

11  (2) they were family members, not "disinterested third part[ies]," (3) the record suggested

12  that they had "financial motivations for [Plaintiff's] receipt of disability benefits" and

13  (4) their opinions were inconsistent with a preponderance of the evidence.[5]  (Tr. 28.)

14  Plaintiff argues that these reasons are not legally sufficient.  (Doc. 15 at 23-25.)

15            **1.**     **Lack of Exacting Observations**

16      The ALJ's disregard of the lay testimony because the witnesses' statements did

17  not include exacting observations as to dates, frequencies, types, and degrees of medical

18  signs or symptoms violates the regulation requiring an ALJ to consider *observations* by

19  non-medical sources.  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing 20

20  C.F.R. § 404.1513(e)(2)); *see also Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d

21  1294, 1298 (9th Cir.1999) (recognizing that lay witnesses are of "particular value"

22  because they can testify to claimant's everyday activities).  The lay witnesses reported

23  their own observations of Plaintiff's limitations and were not required to offer the precise

---

24            [5]  The Commissioner does not defend that ALJ's first three reasons for discounting

25  the lay witness testimony.  Rather, she asserts that the ALJ's first three statements about
the lay witnesses' testimony were not reasons for discounting their testimony, but instead

26  were "alternative hypotheses for their opinions" in an attempt to "explain[] how good
people who were not intentionally fabricating could offer opinions that were inconsistent

27  with the weight of the evidence."  (Doc. 17 at 11.)  The Court rejects this assertion
because review of the ALJ's discussion of the lay witnesses' statements reveals that he

28  gave four reasons for discounting their opinions and did not speculate about why their
testimony was inconsistent with the medical record.  (Tr. 28.)

1  opinion that a medical source might offer.  The Ninth Circuit recognizes the value of this

2  type of lay testimony.  *See Smolen*, 80 F.3d a 1289 (that ALJ must consider the testimony

3  of lay witnesses when the claimant's alleged symptoms are unsupported by medical

4  records).  The ALJ's reliance upon this reason for rejecting the lay witnesses' testimony

5  was error.

6  **2.      Family Members**

7        The ALJ's rejection of the statements of Plaintiff's father and stepmother because

8  they were his parents, not "disinterested third part[ies]," constitutes a "wholesale

9  dismissal of witnesses as a group and therefore does not qualify as a reason germane to

10  each individual who testified."  *Smolen*, 80 F.3d at 1289.  Testimony from lay witnesses

11  who see the claimant regularly is of particular value, and such lay witnesses are often

12  family members.  *Smolen*, 80 F.3d at 1289.  Additionally, the regulations include "other

13  relatives" as "other sources" who may provide evidence.  *See* 20 C.F.R. §§

14  404.1513(d)(4), 416.913(d)(4)  "The fact that a lay witness is a family member cannot be

15  a ground for rejecting his or her testimony."  *Smolen,* 80 F.3d at 1289; *see Morgan v.*

16  *Barnhart*, 142 Fed. App'x. 716, 731 (4th Cir. 2005) ("[I]f family members' evidence was

17  automatically worthless, it would be an odd exercise in futility to even allow them to fill

18  out questionnaires and submit them into evidence"); *Johnson v. Astrue*, 2008 WL

19  4553141, at *6 (C.D. Cal. Oct. 9, 2008) (stating that "the Ninth Circuit has consistently

20  held that bias cannot be presumed from a familial relationship").  Accordingly, the ALJ

21  erred by discounting the opinions of Plaintiff's father and stepmother because they were

22  family members.

23  **3.      Financial Motivation**

24        The ALJ also rejected the opinions of Plaintiff's father and stepmother because

25  they had a financial interest in the outcome of Plaintiff's disability benefits application.

26  (Tr. 28.)   Bias and financial motive may serve as legitimate reasons to discredit the

27  testimony of a third party when those reasons are supported by substantial evidence.  *See*

28  *Greger v. Barnhart*, 464 F.3d 969, 972 (9th Cir. 2006).

- 18 -

Plaintiff's stepmother stated that she and Plaintiff's father paid "all his bills." (Tr. 296.)  She further stated that they were "now to the point of having no savings or credit left to continue."  (*Id.*)  Accordingly, substantial evidence supports the ALJ's discounting of the lay witnesses' testimony based on financial motive.  *See Packer v. Astrue*, 2011 WL 1464905, at *4 (C.D. Cal. Apr. 18, 2011) (finding that evidence that the plaintiff lived with his sister and that she helped him with various tasks was substantial evidence to support the ALJ's discounting of that testimony).

### 4.    Inconsistency with the Medical Evidence

Finally, the ALJ rejected the opinions of Plaintiff's father and stepmother because their opinions were inconsistent with the "opinions and observations by the medical doctor's in this case." (Tr. 28.)  As previously stated, the ALJ must provide reasons "that are germane to each witness" when he rejects lay witnesses' testimony.  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (an ALJ who disregards lay witness testimony must provide germane and specific reasons for each witness).  "One [germane] reason for which an ALJ may discount lay witness testimony is that it conflicts with medical evidence."  *Lewis*, 236 F.3d at 511.  The ALJ's finding is supported by the record as discussed in Section VI.A.1.

Therefore, although the Court does not accept all of the ALJ's reasons for rejecting the lay opinion testimony of Plaintiff's father and stepmother, the Court finds that the ALJ provided legally sufficient reasons for rejecting these opinions.

### C.    The ALJ's Assessment of Dr. Biegen's Opinion and Plaintiff's RFC

Dr. Biegen completed an MRFC assessment on July 23, 2011.  (Tr. 661-63)  On that assessment form, he opined that Plaintiff was mildly limited in some areas of understanding and memory, social interaction, and adaption.  (Tr. 661-62.)  Dr. Biegen further opined that Plaintiff was moderately limited in his ability to remember, understand, and carry out detailed instructions, his ability to "maintain concentration for extended periods," "perform activities within a schedule," to "complete a normal workday and workweek without interruption from psychologically based symptoms," "to

1   perform at a consistent pace," and to accept instructions and criticism from supervisors.

2   (Tr. 661-62.)  The ALJ assigned this opinion "great weight."  (Tr. 28 (citing Admin. Hrg.

3   Ex. 14F).)

4        Plaintiff argues that even though the ALJ assigned "great weight" to Dr. Biegen's

5   opinions, the ALJ failed to include in the RFC Dr. Biegen's specific opinions that

6   Plaintiff had moderate limitations of concentration, persistence, and pace, and thus the

7   ALJ erred in formulating the RFC.  (Doc. 15 at 13.)  Instead, the ALJ formulated an RFC

8   that limited Plaintiff to jobs requiring "the ability to perform simple, unskilled work."

9   (Tr. 23.)  Plaintiff argues that "simple, unskilled" work did not encompass Dr. Biegen's

10   findings regarding Plaintiff's moderate limitations of concentration, persistence, and

11   pace, and that his implicit rejection of Dr. Biegen's opinion was error.  (Doc. 15 at 14.)

12        The Commissioner responds that Plaintiff's argument was rejected in *Stubbs-*

13   *Danielson v. Astrue*, 539 F.3d 1169, 1173-74 (9th Cir. 2008).  (Doc. 17 at 8-9.)  *In*

14   *Stubbs-Danielson*, the Ninth Circuit held that "an ALJ's assessment of a claimant

15   adequately captures restrictions related to concentration, persistence, or pace where the

16   assessment is consistent with restrictions identified in the medical testimony."  *Id.* at

17   1174.  There, the record contained some evidence of the claimant's slow pace, but the

18   only "concrete" functional limitation assessed by the medical sources was a medical

19   source opinion that, despite that slow pace, the claimant could perform "simple tasks."

20   *Id.* at 1173-74.  The ALJ assessed an RFC that limited the claimant to "simple, routine,

21   repetitive sedentary work."  *Id.* at 1173.  The Ninth Circuit concluded that the ALJ did

22   not err in that formulation of the RFC because it was consistent with the medical record

23   and, as a result, the ALJ not err in posing hypothetical questions to the vocational expert.

24   *Id.*

25        This case, however, is more analogous to *Brink v. Comm'r of Soc. Sec. Admin.*,

26   343 Fed. App'x 211 (9th Cir. 2009), which distinguished *Stubbs-Danielson*.[6]  In *Brink*,

27   _____

28        [6] Although *Brink* is an unpublished decision and thus only of persuasive value, its
     discussion of *Stubbs-Danielson* is instructive.

the ALJ accepted medical evidence that the claimant had moderate difficulty with concentration, persistence, or pace, but posed hypothetical questions to the vocational expert based on an RFC that "referenced only 'simple, repetitive work,' without including limitations on concentration, persistence, and pace." *Id.* at 212. In finding error and rejecting the Commissioner's argument based on *Stubbs-Danielson*, the Ninth Circuit explained that:

> In *Stubbs-Danielson* . . . , we held that an "assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony." *Id.* at 1174. The medical testimony in *Stubbs-Danielson*, however, did not establish any limitations in concentration, persistence, or pace. Here, in contrast, the medical evidence establishes, as the ALJ accepted, that Brink does have difficulties with concentration, persistence, or pace. *Stubbs-Danielson*, therefore, is inapposite.

*Id.*

The Court finds that the reasoning of *Brink* is persuasive and supports the conclusion that *Stubbs-Danielson* is not controlling here. *See also Bentancourt v. Astrue*, 2010 WL 4916604, at *3-4 (C.D. Cal. Nov. 27, 2010) (when the ALJ accepted medical evidence of the plaintiff's limitations in maintaining concentration, persistence, or pace, a hypothetical question to the vocational expert including the plaintiff's restriction to "simple, repetitive work," but excluding the plaintiff's difficulties with concentration, persistence, or pace resulted in a vocational expert's conclusion that was "based on an incomplete hypothetical question and unsupported by substantial evidence."); *Melton v. Astrue*, 2010 WL 3853195, at *8 (D. Or. 2010), *aff'd.*, 442 Fed. App'x 339 (9th Cir. 2011) (ALJ erred in her assessment of the plaintiff's RFC when the assessment included the plaintiff's restriction to simple, repetitive tasks, but did not include the plaintiff's mild-to-moderate limitations in maintaining concentration, persistence, or pace).

Here, as in *Brink*, the ALJ accepted Dr. Biegen's opinion that Plaintiff had moderate limitations in concentration, persistence, and pace (Tr. 28 (citing Admin. Hrg. Ex. 14F)), however, the RFC only limited Plaintiff to jobs that required "the ability to

perform simple, unskilled tasks."  (Tr. 23.)   The RFC is incomplete because it did not adequately reflect Dr. Biegen's opinion regarding Plaintiff's moderate limitations that the ALJ had assigned "great weight."  Accordingly, the ALJ erred in formulating the RFC.

That error was not harmless because the ALJ relied, at least in part, on his assessment of Plaintiff's RFC to conclude that vocational expert testimony was not necessary to determine whether Plaintiff could perform work that existed in significant numbers in the national economy, and instead he relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart 4, Appendix 2 (the Grids) to make that determination.  (Tr. 29.)  *See Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an ALJ's error is harmless when it is "irrelevant to the ALJ's ultimate disability conclusion.").  As discussed below, the Grids did not adequately account for Plaintiff's non-extertional impairments.

### D.     The ALJ's Reliance on the Grids

Plaintiff also argues that that the ALJ erred at step five of the sequential evaluation process by relying on the Grids rather than consulting a vocational expert to determine whether he was disabled under the Act because the Grids do not account for Plaintiff's significant non-exertional limitations resulting from his mental impairments.  (Doc. 15 at 22-23.)   The Commissioner responds that Plaintiff's mental impairments were not so severe that they created significant non-exertional limitations, therefore, the use of the Grids was appropriate.  (Doc. 17 at 12-13.)

At step five, the ALJ considers whether a claimant can perform work that exists in the national economy considering the claimant's RFC, age, education, and work experience.  The Commissioner can make a step-five determination by either using "the testimony of a vocational expert or by reference to the Medical Vocational Guidelines."  *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).  The Grids "consist of a matrix of [the four factors including claimant's RFC, age, work experience, and education] and set forth rules that identify whether jobs requiring a specific combination of these factors exist in significant numbers in the national economy."  *Heckler v. Campbell*, 461 U.S.

458, 461–62 (1983). "The [Social Security Administration's] need for efficiency justifies use of the grids at step five where they completely and accurately represent a claimant's limitations." *Tackett*, 180 F.3d at 1101 (internal citation omitted).

The Grids should not be used if they "fail accurately to describe a claimant's particular limitations." *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985). An alleged non-exertional limitation, however, "does not automatically preclude application of the grids. The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." *Tackett*, 180 F.3d at 1102. "A vocational expert is required only when there are significant and 'sufficiently severe' nonexertional limitations not accounted for in the grid." *Hoopai v. Astrue*, 499 F.3d 1071, 1075-76 (9th Cir. 2007) (stating that when a claimant has "significant non-exertional limitations," the ALJ cannot rely solely on the grids); *see also Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988) ("the grids are inapplicable [w]hen a claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations") (internal quotations omitted).

Here, the ALJ found that Plaintiff had the RFC to perform "simple, unskilled work" at "all exertional levels." (Tr. 23.) However, as previously discussed, the ALJ's RFC failed to account for Plaintiff's moderate limitations in concentration, persistence, and pace, which Dr. Biegen assessed and the ALJ adopted. (Tr. 28.) Accordingly, the ALJ erred by applying the Grids despite record evidence suggesting that the Grids may not encompass Plaintiff's non-exertional limitations, including his moderation limitations of concentration, persistence, and pace. Because Plaintiff had non-exertional limitations that are not adequately accounted for in the Grids, the ALJ was required to obtain the testimony of a vocational expert. *See Perkins v. Colvin*, 2013 WL 3930407, at *10 (D. Ariz. Jul. 30, 2013) (finding that ALJ erred by applying the Grids at step five when there was evidence that claimant had non-exertional limitations related to his cognitive impairments and remanding to the Commissioner for further proceedings).

## VII.    Remand for Further Proceedings

As set forth above, the ALJ erred by assessing an RFC that did not account for the moderate limitations of concentration, persistence, and pace assessed by Dr. Biegen and adopted by the ALJ.  Therefore, the Court reverses and remands this matter to the ALJ for the formulation of an accurate RFC that reflects all of Plaintiff's limitations.  *See Harman v. Apfel*, 211 F.3d 1172, 1173-74 (9th Cir. 2000) (stating that the decision to remand for further development of the record or for an award of benefits is discretionary, and remand is appropriate when there are outstanding issues to be resolved before a disability determination can be made).  The ALJ also erred at step five of the sequential evaluation process by failing to obtain the testimony of a vocational expert.  On remand, the ALJ must conduct further proceedings, including obtaining evidence from a vocational expert at step five of the sequential evaluation process.

## VIII.   Child's Disability Insurance Benefits

Plaintiff asks the Court to remand his claim for child's disability insurance benefits to the ALJ for further proceedings to determine the earliest date his conditions were present at a disabling severity pursuant to Social Security Ruling (SSR) 83-20, 1983 WL 31249, at *3.  (Doc. 15 at 18-19 and n.2, Doc. 18 at 11.)  Plaintiff argues that although "no doctor specifically delineated whether Plaintiff established the onset of his disability prior to the age 22 (which is required to establish entitlement to child's insurance benefits)," other evidence in the record supports a conclusion that Plaintiff experienced "severe difficulties with being around others and with attention/concentration and anger before age 22." (Doc. 15 at 18.)  Plaintiff argues that the ALJ was required by SSR 83-20 to obtain a medical expert to determine the earliest date of his disabling conditions.  (Doc. 18 at 19.)

According to SSR 83-20:

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

1    SSR 83-20, 1983 WL 31249, at *3.  Ninth Circuit case law interpreting SSR 83-20 states

2    that it applies when an ALJ is confronted with "ambiguous" evidence about the onset

3    date.  *Armstrong v. Comm'r of Soc. Sec. Admin*., 160 F.3d 587, 590 (9th Cir. 1998).

4         Here, however, the ALJ did not err by not inferring a disability onset date, or by

5    not calling a medical expert to help establish an onset date.  Because the ALJ did not find

6    Plaintiff disabled at any time from the alleged onset date, October 23, 2006, through the

7    date of the ALJ's decision, SSR 83-20 did not apply.  *See Sam v. Astrue,* 550 F.3d 808*,*

8    810 (9th Cir. 2008) (because ALJ found the petitioner was not disabled at any time

9    through the date of the decision, the issue of when he became disabled did not arise and

10   the procedures articulated in SSR 83-20 did not apply); *Scheck v. Barnhart*, 357 F.3d

11   697, 701 (7th Cir. 2004) ("SSR 83-20 addresses the situation in which an administrative

12   law judge makes a finding that an individual *is disabled* as of an application date and the

13   question arises as to whether the disability arose at an earlier time.") (emphasis added).

14        Although SSR 83-20 did not apply to the ALJ's June 6, 2012 decision because he

15   did not find Plaintiff disabled, if the ALJ finds Plaintiff disabled on remand he should

16   determine whether SSR 83-20 applies and, if so, obtain a medical expert to determine the

17   disability onset date.

18        Accordingly,

19        **IT IS ORDERED** that this case is **REVERSED** and **REMANDED** to the ALJ

20   for further proceedings consistent with this Order.  The Clerk of Court shall enter

21   judgment in favor of Plaintiff and against the Commissioner and shall terminate this case.

22        Dated this 9th day of September, 2014.

23

24

25   _____

26                       Bridget S. Bade
                     United States Magistrate Judge
27

28